## FAIRFAX COUNTY REDEVELOPMENT AND HOUSING AUTHORITY

V.

## HURST AND ASSOCIATES CONSULTING ENGINEERS, INC.

Record No. 821511

April 25, 1986

Present: All the Justices

*Thomas P. Dugan (Hall, Surovell, Jackson & Colten, P.C.*, on briefs), for appellant.
*Richard E. Dixon (Robert B. Baumgartner; Dixon and Smith,* on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

By motion for judgment filed below, Fairfax County Redevelopment and Housing Authority (the Authority) sought damages in the sum of $250,000 from Hurst and Associates Consulting Engineers, Inc. (Hurst Inc.), for the latter's alleged breach of a written contract. In the contract, Hurst Inc. agreed to prepare plans and specifications for the replacement of air-conditioning units in an apartment project owned by the Authority.

Hurst Inc. responded by denying liability for the Authority's claim and by filing a counterclaim for the balance allegedly due under the contract. A jury trial resulted in a verdict in favor of the Authority on both its original claim and Hurst Inc.'s counterclaim, with the Authority's damages fixed at $35,000.

The trial court entered judgment on the verdict, and both parties objected; however, only the Authority has appealed. It contends that the court erred in excluding from the jury's consideration certain items of damage allegedly resulting from Hurst Inc.'s breach of contract.

The record shows that the Authority owns Rosedale Manor, a project consisting of 97 apartments built in the early 1960s. Each apartment is served by a separate air-conditioning unit located in an individual "mechanical room."

Beginning in 1972, the Authority experienced "various mechanical breakdowns" in the air-conditioning units, causing serious concern about the cost of repairs. As a result, Clyde G. Hurst, a professional engineer, was employed to study the problem and make a report.

Hurst submitted his report under date of January 21, 1974. The report stated that during the two preceding summers, only about half the air-conditioning units had operated at any one time and

that in the preceding summer, compressors had been replaced on more than half the units. The report also noted that compressors on an additional 17 units needed replacement and that all the units needed rewiring. The report, however, did not recommend replacing the units but stated that in view of the "considerable sum . . . expended during the past two years," the "most economical route" would be the "complete overhaul of the existing units."

On the strength of the Hurst report, the Authority secured from the United States Department of Housing and Urban Development (HUD) "certain funds to upgrade the [air-conditioning] units." Then, in 1978, again using the Hurst report, the Authority obtained funds from HUD to replace all the units.

On May 11, 1979, the Authority and Hurst Inc., of which Clyde G. Hurst was president, entered into the contract now in dispute. In the contract, Hurst Inc. agreed to prepare plans and specifications for the replacement of the air-conditioning units, to assist the Authority in advertising for and securing bids, and to oversee the work as it progressed. By an amendment dated June 13, 1979, Hurst Inc. agreed to give special attention to "energy conservation, easy maintenance, and cost-saving aspects" in the "Drawing and Specifications" required by the original contract.

Following competitive bidding, the Authority awarded a contract to Adrian L. Merton, Inc. (Merton), to replace the air-conditioning units at a price of $121,541. In due time, the units specified in Hurst Inc.'s plans and specifications were received at the job site, and installation began in January 1980. On the very first day of work, however, Merton discovered that the new units were too large to fit into the mechanical rooms and still leave space for maintenance. Work stopped immediately, and efforts were made to find a solution to the problem.

During discussions among the parties, "an idea came up for a split-system unit" which would fit into the available space and yet leave room for maintenance. Hurst Inc. prepared drawings for the use of such a unit and forwarded the drawings to Merton. When Merton reported that the proposal would involve additional costs of $66,998, the idea was abandoned as too expensive.

In June 1980, it was decided that the new units already on hand would be used by turning them sideways in the mechanical rooms, with a portion of each unit extending through the doorway onto the balcony outside. After nine of the units had been installed in

this manner, another problem was encountered; every time a unit was turned on, a fuse would "blow."

An investigation revealed that the wiring in 84 of the 97 apartments was not heavy enough to carry either the units originally specified by Hurst Inc. or the split system units recommended as alternatives. The fact that the nine units had been installed partly within and partly without the mechanical rooms had no effect on the electrical problem.

Work again stopped on the project and had not resumed at the time of trial. Indeed, the old air-conditioning units were still in use at that time.

When work was stopped, the Authority had paid Merton $101,055 on its contract. Then, more than a year after work stopped, the Authority paid Golden Construction Company, Inc., $1,350 for construction of a basement storage area to house the unused air-conditioning units until they could be disposed of by the Authority.[1]

The trial court first admitted the evidence concerning the expenses for repairing the old air-conditioning units but later struck out this evidence on Hurst Inc.'s motion. The court said "those [expenses] are consequential damages which [were] beyond the scope of any intention [of] the parties at the time . . . the contract . . . was entered into." The court ruled that the evidence concerning the cost of constructing the storage area was inadmissible because this expense was "remote" and constituted "consequential" damage not "anticipated" by the parties.[2]

■ Consequential damages are compensable if they were within the contemplation of the parties at the time they entered into their contract. Whether a particular item constitutes consequential damage is a question of law for the court, but whether the damage was within the contemplation of the parties generally is a question of fact for the jury. *Morris* v. *Mosby*, 227 Va. 517, 523, 317 S.E.2d 493, 497 (1984); *Roanoke Hospital* v. *Doyle and Russell*, 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975).

---

[1] The unused air-conditioning units were removed from the job site after work stopped, and they were stored in a warehouse belonging to Merton. The units were returned to Rosedale Manor after Merton notified the Authority it would no longer store them.

[2] Hurst Inc. argues on brief that the Authority has not properly preserved or assigned error to the trial court's rulings. We disagree with Hurst Inc. and proceed to dispose of the case on its merits.

The Authority concedes that the repair and storage expenses constitute consequential damages, and it does not question the trial court's holding on this phase of the matter. The Authority maintains, however, that the trial court usurped the jury's function when it went further and held as a matter of law that the damages were not within the contemplation of the parties at the time they contracted.

We agree with the Authority. Hurst Inc.'s breach in this case consisted of its failure to specify air-conditioning units of a size, shape, and capacity that would be usable in the Authority's replacement project. That Hurst Inc. specified unusable units is established by the jury's verdict in favor of the Authority, a verdict Hurst Inc. has not questioned in this appeal.

We think that any reasonable person in Hurst Inc.'s position in May 1979, when it contracted to draft plans and specifications for the replacement project, would have known that if incorrect units were specified, losses of the nature of those involved here would likely result. After all, Clyde G. Hurst, president of Hurst Inc., was the author of the 1974 report. He probably knew better than anyone else what repair expenses the Authority would incur if replacement of the old air-conditioning units was delayed by the specification and attempted use of the wrong units.

Furthermore, Hurst Inc. was bound to know that if it specified the wrong air-conditioning units for use in the replacement project, the Authority would have to store the units somewhere for some period of time before they were disposed of. Hurst Inc. also had reason to know whether the Authority would have ready space on site to store the air-conditioning units that turned out to be unusable. Clyde Hurst had been "escorted . . . throughout the [apartment] project" before he made the 1974 report and he "walked through the . . . project" before he agreed on behalf of Hurst Inc. to prepare the plans and specifications for replacement of the air-conditioning units.

■ Given the history of the involvement of Hurst Inc. and its president in the Authority's efforts to solve the air-conditioning problems, we have no difficulty in finding that the evidence was sufficient to make a jury issue of the question whether the repair and storage expenses were within the contemplation of the parties at the time they contracted. Accordingly, we will reverse the judgment appealed from to the extent that it reflects the exclusion of the repair and storage expenses from the jury's consideration. We

will remand the case for a new trial limited to the question whether the Authority is entitled to recover those expenses.

On retrial, in addition to the issue whether the parties contemplated the repair and storage damages at the time they contracted, Hurst Inc. will be entitled to have the jury consider several points it erroneously says we should decide as matters of law. These points include the reasonableness of the length of time the Authority waited before disposing of the unused air-conditioning units, the reasonableness of the cost of repairs claimed by the Authority, the reasonableness of the period of time for which repairs are claimed, and the difference, if Hurst Inc. can show a difference, between the estimated cost of repairing the new air-conditioning units, had they been installed, and the actual cost of repairing the old units.

For reasons we believe are obvious, Hurst Inc. will not be entitled to further consideration of several other points it has raised on appeal. Included are arguments that the Authority should not recover repair expenses because maintenance of the old air-conditioning units was less expensive than installation of new units, that the cost of repairs resulting from continued use of the old units constituted a "pre-existing condition" for which Hurst Inc. is not liable, and that the repair and storage expenses are not recoverable because the Authority has already received a " 'windfall' recovery" in the $35,000 verdict it received at the hands of the jury.

We will reverse the judgment of the trial court to the extent indicated and remand the case for a new trial limited as outlined above.

*Reversed and remanded.*